MARK GOLDROSEN, CBN 101731
Attorney at Law
255 Kansas Street, Suite 340
San Francisco, California 94103
TEL: (415) 565-9600
FAX: (415) 565-9601

Attorney for Defendant
ANTONIO GILTON

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO VENUE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR-13-00764-002 WHO |
| Plaintiff, | ) | DEFENDANT ANTONIO GILTON'S SENTENCING MEMORANDUM |
| vs. | ) | |
| ANTONIO GILTON, | ) | |
| Defendant. | ) | DATE: October 4, 2019 |
| _____ | ) | TIME: 1:30 p.m. DEPT: Hon. William H. Orrick |

Defendant ANTONIO GILTON, remorsefully appears before this honorable Court for entry of judgment and sentencing. Due to substantial mitigating circumstances relating to Mr. Gilton's background and character, and his lesser role in the offense, the defense respectfully requests that the Court accept the parties' plea agreement and impose a sentence of 240 months (20 years) of imprisonment.

## I. PLEA AGREEMENT.

Mr. Gilton and the government entered into a written plea agreement pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. Mr. Gilton pled guilty to racketeering conspiracy in violation of 18 U.S.C. § 1962(d) (Count One) and Use of Firearm Causing Death or Aiding and Abetting, in violation of 18 U.S.C. §§ 924(j) and 2 (Count Four). The plea agreement calculated Mr. Gilton's adjusted offense level under the Sentencing Guidelines to be 41. The parties reached no agreement regarding Mr. Gilton's

criminal history category.

The parties agreed that a sentence within the range of 20 to 25 years was a reasonable and appropriate disposition of this case.  They also agreed that Mr. Gilton would be placed on supervised release for a term of five years upon his release from custody, that the Court would determine the amount of any fine and restitution, and that Mr, Gilton would have to pay a special assessment of $200.

## II.    PRESENTENCE INVESTIGATION REPORT (PSR).

The PSR calculates Mr. Gilton's total offense level to be 41 for Count One and his criminal history score to be 7 (criminal history category IV).  PSR at ¶¶ 64, 73.  Given these calculations, the applicable advisory guidelines range for Mr. Gilton is 360 months to life for Count One, plus a consecutive 120 months for Count Four. The PSR concludes that a downward variance from the guidelines range is warranted, and recommends a total term of imprisonment of 300 months (180 months for Count One plus 120 months for Count Four). The recommended sentence is the high-end of the range agreed to by the parties pursuant to Rule 11(c)(1)(C).

## III.   DEFENSE OBJECTIONS AND COMMENTS REGARDING PSR.

In compliance with Crim. L.R. 32-4(b) and (c), the defense provided the probation officer with written objections to the proposed presentence report.  The PSR discusses the objections that remain unresolved.  Below, the defense elaborates on some of these unresolved  objections.

A.     Offense Conduct - Page 13, Paragraph 39,

Pursuant to the defense request, this paragraph now clarifies that Calvin Sneed was shot at, but not actually shot, in Los Angeles.  The defense further requested clarification that Antonio Gilton was not in Los Angeles at the time of the shooting on May 27, 2012.  Cell site location data corroborated that he was in Las Vegas, Nevada.  The PSR should have also included this information in paragraph 39.

B.     Offense Conduct - Pages 13-14, Paragraph 40.

The draft PSR identified multiple enterprise-related motives for the Calvin Sneed

murder.  According to the draft, Sneed was murdered: (1) because "he had disrespected them and the CDP gang generally by pimping out" the minor woman; (2) "to maintain and enhance the position of these three men in the CDP gang," and (3) "to maintain and enhance the reputation of CDP as a gang that will commit violence to protect the interests of its members and associates."  Antonio Gilton had two objections to this statement.  First, he said that another purpose of the murder was  to protect the minor family member from being harmed by Calvin Sneed, who was forcing her to engage in prostitution.  The final PSR incorporates this correction into Paragraph 40.

Second, the defense noted that while Antonio Gilton admitted in his plea agreement and continued to agree that maintaining and enhancing his position in CDP was a substantial motive for the murder, he did not agree that either motive no. 1 (disrespect for him and CDP) or motive no. 3 (reputation of the gang as being violent) played a role in the murder.  In overruling this objection, the PSR misstates the defense position.  According to the PSR, Antonio Gilton "admitted" all three gang-related motives for Sneed's murder.  That is not the case.  Mr. Gilton's position is that a substantial purpose of the killing was to maintain and enhance his position in CDP and another purpose was to protect a family member from harm. The murder did not have other purposes.

C.      Offense Conduct, Page 16 -  Paragraph 48.

Pursuant to the defense request, this paragraph now explains that CDP members took Mr. Gilton's gun from him after he did not retaliate for the killing of Skylar Stewart in 2005. The PSR identifies "defense counsel" as the source of this information.  However, as explained in the objection, the source is the government, as the information is contained in the discovery provided to the defense.  The PSR should correct the identity of the source of the information.

**V.      MR. GILTON RESPECTFULLY REQUESTS THAT THE COURT IMPOSE A SENTENCE OF 240 MONTHS OF IMPRISONMENT.**

In *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008), the Ninth Circuit explained that,

- 3 -

The overarching statutory charge for a district court is to "impose a sentence sufficient, but not greater than necessary" to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. 18 U.S.C. § 3553(a) and (a)(2).

All sentencing proceedings are begun by the district court calculating the applicable guidelines range. The district court then should consider the sentencing factors set forth in section 3553(a) to determine if they support the sentence suggested by either of the parties. *Carty*, 520 F.3d at 991. These factors include:

the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed; the kinds of sentences available; the kinds of sentence and the sentencing range established in the Guidelines; any pertinent policy statement issued by the Sentencing Commission; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims. 18 U.S.C. § 3553(a)(1)-(7).

*Id*.

Here, as discussed below, a review of the relevant mitigating circumstances supports the sentence requested by Mr. Gilton.

A.    The Calvin Sneed Murder Was Motivated in Part by a Desire to Protect a Loved One from Being Harmed by Her Pimp.

In the plea agreement, Mr. Gilton forthrightly acknowledged that "[a] substantial purpose for this murder [of Calvin Sneed] was to maintain and increase position in the enterprise." Plea Agreement at ¶ 2. That substantial motivation was part of the factual basis for Mr. Gilton being guilty of Counts One and Four of the Superseding Indictment. The killing of Mr. Sneed, however, had a secondary purpose. Mr. Gilton was also trying to protect a beloved family member from being harmed by her pimp. PSR at ¶ 40. That additional purpose does not justify or excuse the murder. However, it is important for the Court to consider the murder in this context.

Calvin Sneed was a pimp who was prostituting minor L.G, the daughter of Mr. Gilton's cousin, Barry Gilton. In 2002, when Mr. Gilton was 16, his mother moved from San

Francisco to Antioch.  Mr. Gilton did not want to leave San Francisco, where he had grown up and had friends.  Mr. Gilton moved in with Barry and his wife, Lupe Mercado, and their three children, at their residence at McAllister and Webster Streets.   Mr. Gilton became very close to everyone in Barry Gilton's family.  He referred to Lupe as "mom" and L.G. as his "sister."  In turn, L.G. referred to Mr. Gilton as her "older brother."

Mr. Gilton continued to live with Barry and his family off and on over the next few years.  Later, in November 2011.when  L.G. was having problems in San Francisco.  Barry and  Lupe sent L.G. to stay with Mr. Gilton.  At that time, Mr. Gilton was living with his partner and children in  in Los Angeles.  Mr. Gilton served as L.G.'s guardian and she lived at his residence until Calvin Sneed was killed. Mr. Gilton was extremely upset to learn that L.G. had become a prostitute for Sneed.  That concern was exacerbated by L.G.'s insistence on returning to Los Angeles with Sneed on June 4, 2012, rather than remaining in San Francisco after a family visit.  PSR at ¶ 40.  The Gilton family hoped that L.G. would separate from Sneed.  Sneed was a member of a Los Angeles street gang and had previously been arrested for domestic violence.  In addition, L.G. had a bruise on her face from being struck by Sneed during the trip to San Francisco.  Mr. Gilton's desire to help protect L.G. from suffering further harm at the hands of Sneed was an undeniable part of his motivation for participating in the murder.[1]

      B.    Mr. Gilton Was Not Directly Involved in Other Violent Crimes Committed by CDP.

The PSR describes numerous crimes committed by CDP members, including many crimes of violence.  These violent crimes include six murders, three attempted murders, and numerous armed robberies.  PSR at ¶¶ 19-47.  Aside from the Sneed murder, in which the victim was pimping his relative, Mr. Gilton was not directly involved in any of these violent crimes.  In fact, according to the government's discovery, CDP members were upset with Mr.

---

[1]Although Alfonzo Williams was not a relative, he was very close friends with Antonio and Barry Gilton and their families.

Gilton because of his reluctance to engage in retaliatory violence.  In 2005, Mr.  Gilton was in a vehicle with Skylar Stewart when persons shot at the car, killing Stewart and wounding Gilton.  CDP members became upset with Mr. Gilton because he did not later retaliate against the persons who had done the shooting.  These CDP members went so far as to take Mr. Gilton's gun from him because, as they explained, he was not using it.  PSR at ¶ 48.

Mr. Gilton's lack of involvement in crimes of violence other than the Sneed murder is also evident from his criminal history.  Mr. Gilton has no convictions, and only one prior arrest, for a crime of violence.  PSR at ¶¶ 67-88.  At age 13, Mr. Gilton was arrested for robbery and conspiracy, but released without being prosecuted.  PSR at ¶ 85.  It is also alleged that on April 19, 2007, Mr. Gilton possessed a gun in connection with an exchange of gunfire.  Significantly, Mr. Gilton was convicted only of unlawful possession of the firearm.  He was  not found guilty of any crimes related to firing the weapon.  PSR at ¶ 68.

C.    Mr. Gilton Made Efforts to Break Away from CDP.

As Mr. Gilton became older and more mature, he made efforts to break away from CDP.  While these efforts were ultimately unsuccessful, they are worthy of consideration by this Court.  In August 2007, Mr. Gilton moved from San Francisco to Los Angeles in order to get away from bad influences in his neighborhood.  PSR at ¶ 93.  Initially, he lived alone in a studio apartment at West 73rd and Crenshaw Streets.

In February 2009, Mr. Gilton's partner, Amber Hernandez joined him in Los Angeles At the end of the school year, their oldest daughter, Tamia, came to live with them.  On June 1, 2009, Mr. Gilton moved his family to a larger apartment at 3750 Delmas Terrace.  On June 15, 2010, after Amber gave birth to twin sons, Mr. Gilton and his family moved again, to 1074 Lawler Street, #8, Los Angeles.  Mr. Gilton maintained this residence until the time of his arrest in this case.

While in Los Angeles, Mr. Gilton went to school and had employment.  He studied acting at Los Angeles City College from 2007 to 2008 and at Santa Monica Community College in 2010.  PSR at ¶ 106.  In 2009 and 2010, Mr. Gilton worked full time at Hollywood Video and later did odd jobs to support himself and his family.  PSR at ¶¶ 108-109.

1    Unfortunately, the allure of San Francisco and old friends proved too much and Mr.

2  Gilton returned to San Francisco for occasional visits.  It was on one such visit that the Sneed

3  murder occurred.

4         D.    Mr. Gilton's Criminal Record Is Not Substantial.

5    Mr. Gilton does not have a substantial criminal record.  He has no adjudications as a

6  juvenile and only three convictions as an adult, two felonies and one misdemeanor.  PSR at

7  ¶¶ 67-70.  The misdemeanor conviction was for driving on a suspended license in 2008.  The

8  felony convictions were for carrying a concealed weapon in a vehicle in 2007 and possession

9  of crack cocaine for sale in 2008.  In the latter case, Mr. Gilton was found with three rocks

10  of crack cocaine on his person.  He told a probation officer that he was broke  and needed

11  money to help his then-girlfriend pay for an abortion.  PSR at ¶ 69.  As already noted, none

12  of the crimes for which Mr. Gilton was convicted involved violence, threats of violence, or

13  use of a weapon.

14    It is also significant that Mr. Gilton has never previously served a lengthy period of

15  incarceration or a sentence that involved incarceration in a prison.  For both of his felony

16  convictions, Mr. Gilton was placed on probation with conditions that included custody in

17  county jail.  The longest jail sentence previously served by Mr. Gilton was seven months.

18  Certainly, a 20-year term of imprisonment in this case will serve as substantial punishment

19  for Mr. Gilton.

20         E.    Mr. Gilton Is in a Stable Relationship with His Partner and Is Very Involved
                 in the Lives of Their Three Children.
21

22    Mr. Gilton is currently in a stable relationship with his partner.  He and Amber

23  Hernandez, a receptionist, began their relationship in 2000, when he was 14 years old and

24  she was 15 years old.  They have three children together.  Tamia Gilton was born in 2002

25  (age 17) and twins Sontino Gilton and Antonio Gilton were born in 2010 (age 9).  PSR at ¶¶

26  94-95.  Mr. Gilton, Amber, and their children lived together in Los Angeles from 2009 until

27  the time of his arrest.

28    Mr. Gilton was very involved in the lives of his children prior to his arrest and

- 7 -

1   continues to be a supportive father while in jail.  Tamia is a senior at the Academy of Art and

2   Science in San Francisco, where she receives grades of A in all her classes.  PSR at ¶ 95.

3   She is currently applying to college and plans to study medicine.  She writes, in her attached

4   letter, that "her dad, despite  being in a very scary and challenging situation, remains a

5   positive figure for me and my brothers.  He calls about every day, whether it is to check up

6   on school or whatever else is going in my life, my mom's or my brothers (sic)."  Mr. Gilton

7   also does "his best to check in with me, remind me about important deadlines, and give

8   advice about the college application process."  Tamia further writes she is "so proud of my

9   dad for continuing to be an active supporter in all my hobbies and interest.  For being

10  invested in my education and happiness."  She has  "so much love for him," as Mr. Gilton

11  "lets me know every day how much I mean to him and  how proud of me he is."  Letter of

12  Tamia Gilton.

13       Amber's letter corroborates that Mr. Gilton has not abdicated his role as a father

14  despite his incarceration.  She writes, "I am thankful everyday for the fact he chooses to

15  remain an active parent. . . . He never lets his incarceration deter him from his obligations."

16  Amber believes that Mr. Gilton "has done his best in the last 7 years to stay positive and be

17  strong for [the family]." Letter of Amber Hernandez.

18       Mr. Gilton's close relationship with Amber and their children will be a powerful

19  incentive for him to be a law-abiding, productive citizen upon his release from imprisonment.

20       F.   Mr. Gilton Experienced Significant Traumas and Hardships in Childhood,
             Adolescence, and Early Adulthood.
21

22       As noted in the Justification to the PSR's sentencing recommendation, Mr. Gilton

23  experienced many traumas and hardships from childhood to early adolescence.  While these

24  adverse experiences in no way excuse Mr. Gilton's criminal conduct as an adult, they provide

25  some context to the decisions he made.

26       Mr. Gilton was raised in a violent neighborhood of San Francisco.  His parents

27  separated when he was three years old and his father was absent while serving a federal

28  prison sentence during some of his formative years.  Mr. Gilton witnessed two people

murdered that were his close friends. When asked by the probation officer how growing up in such a violent area affected him as an adult, he candidly responded that he was "peer pressured to act a certain way or felt [he] would be taken advantage of."  He further explained that "you were either a part of a group or they were against you if you did not participate."  PSR at ¶ 93.

The PSR further notes that Mr. Gilton has a loss of hearing in his left ear and difficulty hearing in his right ear due to contracting meningitis as a child. He has been shot on two different occasions, and stabbed on another occasion.  As the PSR correctly concludes, these factors amount to mitigating circumstances regarding Mr. Gilton's history and characteristics that warrant a lesser sentence.

## VI.    MR. GILTON SHOULD NOT BE PROHIBITED FROM HAVING CONTACT WITH LUPE MERCADO WHILE ON SUPERVISED RELEASE.

The PSR recommends that Mr. Gilton be prohibited from having contact with all of his co-defendants, except relative Barry Gilton, while on supervised release.  The defense requests that Mr. Gilton also be permitted to have contact with Lupe Mercado. As an initial matter, Ms. Mercado has not yet been convicted of any crime related to Mr. Gilton's case. More importantly, Lupe is a relative through marriage.  She is married to Barry and Mr. Gilton is very close to both of them.  As a teenager, he lived with Barry and Lupe, and referred to Lupe as "mom."  Given this close relationship, Mr. Gilton should be permitted to have contact with  Lupe Mercado, as well as Barry Gilton, while on supervised release.

## VII.    CONCLUSION

Due to the many mitigating circumstances outlined above and in the PSR, the court should accept the plea agreement made by the parties and sentence Mr. Gilton to 240 months (20 years) of imprisonment.  Such a sentence will be "sufficient, but not greater, than

1   necessary" to comply with the purposes set forth in paragraph (2) of 18 U.S.C. § 3553(a).

2   DATED: September 23, 2019                    Respectfully submitted,

3

4

5                                               /s/ Mark Goldrosen
                                                MARK GOLDROSEN
                                                Attorney for Defendant
6                                               ANTONIO GILTON

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28